Civil Action No. 14-cv-317 (EGS)

# EXHIBIT 1
# Declaration of Douglas W. Poole

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) |
| Plaintiff | ) Civil Action No. 14-cv-317 (EGS) ) |
| v. | ) **FILED EX PARTE and UNDER** ) **SEAL** |
| DRUG ENFORCEMENT ADMINISTRATION, | ) ) |
| Defendant | ) |

DECLARATION OF DOUGLAS W. POOLE

I, Douglas W. Poole, pursuant to the provisions of 28 U.S.C. §1746, declare as follows:

1. I am the Drug Enforcement Administration (DEA) Chief of Intelligence. I have served in this position since September of 2015. Prior to September of 2015, I was the Acting DEA Chief of Intelligence. I was selected to be the DEA Deputy Chief of Intelligence in October of 2010.

2. As Chief of Intelligence, my responsibilities include serving as DEA's senior representative to the United States Intelligence Community and the executive leader of DEA's Intelligence Division, including the El Paso Intelligence Center, and the DEA cadre at the Organized Crime Drug Enforcement Task Force Fusion Center.

3. DEA's Intelligence Division is responsible for the collection, analysis, and dissemination of drug-related intelligence in coordination with other federal, state, local, and foreign law enforcement organizations. The DEA Intelligence Program helps initiate new investigations of major drug organizations, strengthens ongoing ones and subsequent

1

prosecutions, develops information that leads to seizures and arrests, and provides policy makers with drug trend information upon which programmatic decisions can be based.

4. I manage a budget of more than $100 million. I develop policy for a staff of approximately 1,300 individuals, including more than 1000 Intelligence Analysts assigned worldwide.

5. I was first appointed to the ranks of the Senior Executive Service in July of 2006 as the head of the DEA Office of National Security Intelligence, the component of DEA that is a formal member of the U.S. Intelligence Community.

6. I began my career with DEA in 1991 as an Intelligence Analyst at DEA Headquarters. My initial assignments focused on Traditional Organized Crime cases and investigations targeting individuals suspected of involvement in terrorist-related groups and drug-related political corruption. From 1995 to 1997, I served on the Executive Policy and Strategic Planning Staff under the DEA Deputy Administrator and then as the Special Assistant to the Chief of Intelligence. From 1997 to 2000, I served as the Chief, Interagency Policy and Liaison Unit at DEA Headquarters. In this position, I coordinated with federal, state, and local agencies, as well as private sector and foreign agencies, to facilitate investigative and strategic intelligence collection, research and analysis, and information sharing in support of DEA programs and U.S. drug law enforcement efforts.

7. In 2000, I transferred to the DEA Atlanta Field Division. There, I supervised the Metropolitan Atlanta Joint Intelligence Group (MAJIG) of the Atlanta High Intensity Drug Trafficking Area (HIDTA) Task Force. The MAJIG, comprised of personnel from five different federal, state, and local agencies, was responsible for providing intelligence support to the enforcement groups operating under the Atlanta HIDTA.

8. In 2005, I was assigned as Chief of the Intelligence Policy and Liaison Section where I was responsible for managing and developing policies related to the internal and external aspects of DEA's intelligence programs, including high-level information sharing and exchange protocols.

9. I am a member of the U.S. Naval Academy Class of 1980. I was awarded a Master of Arts in International Relations by the University of Maryland at College Park. The University of Maryland also awarded me a Bachelor of General Studies in General Engineering Technology, with a minor in Global Affairs.

Background and Initial/Preliminary Matters

10. I am submitting this Declaration in response to the Court's Memorandum Opinion dated June 24, 2016 (Memorandum Opinion) and in support of DEA's application of Freedom of Information Act (FOIA) exemptions to certain information responsive to the Electronic Privacy Information Center's (EPIC) request for information about the Hemisphere program. When the public disclosure of the information in my Declaration would reveal information that DEA withheld from the public by application of a FOIA exemption, or would reveal other non-public DEA law enforcement sensitive information I am providing to the Court to defend DEA's actions in this litigation, the information is being redacted from the public version of my Declaration. I would be acting contrary to my responsibilities as DEA's Chief of Intelligence to release this information to the public.

11. The statements I make in this Declaration are made on the basis of my familiarity with the Plaintiff's request, my familiarity with the responsive records gathered for the Plaintiff's request, and my personal knowledge or information acquired by me through the performance of my official duties.

12. DEA did not create, nor has it managed, the Hemisphere program and, thus, neither I nor any other DEA employee is in a position to provide the Court with firsthand information about every aspect of Hemisphere.

13. Due to my official job responsibilities, I am familiar with and knowledgeable about DEA's Intelligence Program. I oversee DEA Intelligence staff who, through subpoena or court order, have utilized the Hemisphere program to obtain data. I am familiar with EPIC's letter that is the basis of this suit. I have reviewed all of the responsive pages DEA gathered in response to EPIC's letter. Since the issuance of the Court's Memorandum Opinion, I re-reviewed the pages on which redacted information remains at issue.

14. 

General Matters

15. On page 35 of the Memorandum Opinion, the Court noted that the government did not confirm statements made in the press regarding telecommunications companies and Hemisphere. In my experience, press reports about these kinds of law enforcement matters are not necessarily accurate.

16. To the best of my knowledge, DEA has not publicly disclosed the information DEA continues to withhold.

17. The nature, extent, and breadth of today's most significant drug traffickers' activities continue to challenge DEA's law enforcement efforts. As law enforcement advances in its knowledge of criminality and violators' tactics, it can close the knowledge and time gaps between its investigative efforts and criminality. On the other hand, as law enforcement develops successful prosecutions, criminals learn law enforcement techniques and procedures and adjust their criminal methodologies to evade law enforcement investigative efforts. This law enforcement-violator learning process cycle continuously evolves.

18. Most complex criminality, regardless of the number of violators, involves electronic communications. Law enforcement agencies' subpoenas to telecommunications companies often obtain information that will help lead to the apprehension and prosecution of violators.

The Hemisphere Program

19. The Hemisphere program has helped law enforcement close in on violators despite the criminals' evasive communications practices. This is vitally important to DEA and DEA's ability to achieve its mission; in my experience, it is important to other law enforcement entities as well. "Success Stories" or examples of how the Hemisphere program has assisted law enforcement appear in the records gathered in response to EPIC's FOIA request. According to the responsive records, for example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



20.

21.

22.

image covers most


23.

24.

25.

26. Pages 286 and 287 of the gathered responsive records constitute the

27. Page 286 shows ▇

28. The material on page 287 follows ▇ page 286.

29. Page 287 also shows 

30.

Information Naming or Otherwise Identifying Entities that Are Instrumental in the Operation of the Hemisphere Program

31. It is clear to me both that law enforcement has diligently worked to maintain, and the entities instrumental in the operation of Hemisphere have expected, confidentiality for their involvement in Hemisphere.

32. Pages 286 and 287 reflect law enforcement's, ████████████████████ ████████████████████████████████████████ *Supra* paragraphs 26-29.

33. In my experience, it is reasonable for ████████████ ████████████████████████████████████████ ████████████████ In my experience, ████████████████ ████████████████████████████████████████ ████████████████████████████████████████

34. In my experience, it is also reasonable for ████████ ████████████████████████████████████████ ████████████████████████████████████████

Based on my knowledge, the Hemisphere program has helped law enforcement investigate and

solve crimes committed by extremely violent individuals and organizations. These violators have the means, incentive, and history of threatening and attacking law enforcement. Based on my experience, confidential sources and others who cooperate with law enforcement are at greatly elevated risk of being threatened and harmed when exposed. Again, in my experience,



35.

For these reasons, it is appropriate for DEA to withhold from public disclosure

36.

37.

▇▇▇ The focus of DEA's criminal law enforcement mission is national and international drug trafficking organizations, criminality that tends to be violent. The law enforcement entities mentioned in the responsive records, and withheld from public release, show the broad range of law enforcement entities that have used Hemisphere. Some of the responsive records provide examples of the crimes whose successful investigations were hinged on ▇▇▇ *See also supra* paragraph 19. Each crime in the responsive records' sampling for which Hemisphere provided assistance is violent or involved potential harm to an individual.

38. ▇▇▇

39. ▇▇▇


40. Hemisphere is not a DEA program, so I am not in a position to provide a comprehensive list of violent crimes and the concomitant risk of retaliation associated with those crimes. Based on my experience, the Hemisphere program has helped law enforcement investigate and solve crimes committed by extremely violent individuals and organizations. These violators have the means, incentive, and history of threatening and attacking law enforcement because law enforcement investigates, apprehends them and their co-conspirators, and puts them out of business. DEA's "Wall of Honor," which shows the pictures of over sixty law enforcement officers killed in the line of duty, indicates the violence associated with the crimes DEA is charged with investigating. Moreover, virtually every law enforcement agency has a similar memorial, again a testament to the violence perpetrated by those involved in a host of crimes that the Hemisphere program has helped solve. Based on my experience, confidential sources and others who cooperate with law enforcement are at greatly elevated risk of being threatened and harmed when exposed. This is why law enforcement employs every legal means available to preserve the safety of its confidential sources and to continue to receive the assistance that confidential sources provide.

41. The public release of the identities of the entities that cooperate in the operation of Hemisphere could reasonably be expected to risk circumvention of the law. As discussed *supra*, in paragraphs 22, 24, 25, and 30, [redacted]

13



In my experience, it is not unusual for those who commit the violations that DEA investigates to use violence to accomplish their criminality. It is also my experience that DEA facilities have been threatened and DEA employees and cooperators killed due to their efforts on behalf of DEA. *Supra* paragraph 40. Thus, disclosure of the identities of the cooperating entities could reasonably be expected to risk circumvention of the law.

<u>Information Naming or Otherwise Directly Identifying Law Enforcement Agencies, Other Than DEA, Whose Names Are in the Responsive Records as Having Access to Hemisphere</u>

42. DEA withheld the names of multiple law enforcement agencies whose names are in the responsive records as having access to the Hemisphere program. DEA did not withhold its name from the responsive records.

43. Information about specific law enforcement agencies that have access to the Hemisphere program could help criminals evade apprehension. For example, if it were made public that the █████████████████████████████████████████████████████████████ would be informed that Hemisphere could be used against them and thus might be more vigilant about how they commit crimes. That could make it more difficult to detect or apprehend those violators. In addition, knowing that Hemisphere █████████████████

14



would put violators on notice that the Hemisphere program could be used against them even if their activities ▮▮▮▮▮ This, again, ultimately could help violators tailor how they commit crimes to evade apprehension. Finally, the release of this information would deprive ▮▮▮

### Information Detailing the Means Through Which Hemisphere Secures the Cooperation of Entities Instrumental in Hemisphere's Operation, and References to that Information

44. Disclosure of the text of the ▮▮▮ would reveal



As noted above, entities that cooperate with law enforcement often face threats from persons who find cooperation with law enforcement objectionable. This can lead persons to take action against entities either through lawful means, such as taking their business elsewhere or organized protest, or through unlawful means, such as threats, vandalism, or cyberattacks. Risks of either kind would be harmful to ▮▮▮. It could reasonably be expected that disclosure of the fact that the Hemisphere program has been provided would increase the risk of circumvention of the law because the entities instrumental in the operation of Hemisphere would likely choose to discontinue their cooperation. *Supra* paragraphs 33-35. This would risk making an important investigative tool unavailable and this could risk circumvention of the law.

15

45. ███████████████████████████████████ *Supra* paragraphs 26-29. ███████████████████████████████████ This could reasonably be expected to risk circumvention of the law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9/20/16.

DOUGLAS W. POOLE
Chief of Intelligence
Drug Enforcement Administration
Arlington, VA 22202

16